**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LATOYIA T. M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 20 C 5624** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Latoyia T. M. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed and the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for DIB and SSI on November 21, 2018, alleging in both applications that she became disabled on July 11, 2018 due to a herniated disc following an auto accident, sciatica, carpal tunnel syndrome, and lumbar strain. (R. 196-208, 233).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

Born in January 1978, Plaintiff was 40 years old at the time of her applications and was at all times a younger person (under age 50). (R. 196); 20 C.F.R. § 404.1563(c); 20 C.F.R. § 416.963(c). She received her GED and lives alone in a condominium. (R. 33, 234). From 2012 to 2013, Plaintiff worked as a home health aide. (R. 35-36). After briefly working in retail in 2015, she took a job doing data entry for an insurance company in November 2015. (R. 34-35, 234). Plaintiff started a new data entry job in March 2018 but she stopped working on July 11, 2018 after she was injured in a motor vehicle accident. (R. 48, 234). Plaintiff has not engaged in any substantial gainful activity since that date.

The Social Security Administration denied Plaintiff's applications initially on February 27, 2019, and again upon reconsideration on May 16, 2019. (R. 63-114). Plaintiff filed a timely request for a hearing and appeared before administrative law judge William Spalo (the "ALJ") on March 2, 2020. (R. 28). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Jessica A. Coles (the "VE"). (R. 30-66). On March 24, 2020, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine and degenerative disc disease of the cervical spine are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16-18). After reviewing the evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work involving: occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; and no climbing of ladders, ropes, or scaffolds. (R. 18).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could perform Plaintiff's past relevant work as a data entry clerk and a customer

service representative.  (R. 21).  Alternatively, the ALJ adopted the VE's conclusion that a person such as Plaintiff could perform a significant number of other jobs available in the national economy, including garment sorter, mail clerk, and folder.  (R. 21-22).  As a result, the ALJ concluded that Plaintiff was not disabled at any time from the July 11, 2018 alleged disability onset date through the date of the decision.  (R. 22-23).  The Appeals Council denied Plaintiff's request for review on July 20, 2020.  (R. 2-6).  That decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. §§ 405(g).  *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) failed to provide a logical bridge between the evidence and the RFC determination; and (2) erred in relying on VE testimony without asking about conflicts with the Dictionary of Occupational Titles.  For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## **DISCUSSION**

### A.    **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  *See also L.D.R. by Wagner v.*

*Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019).  The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI, a claimant must establish that she is disabled within the meaning of the Social Security Act.[2]  *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016).  A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§

---

[2]    Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## C.     Analysis

### 1.     RFC Determination

Plaintiff argues that the case must be reversed or remanded because the ALJ failed to build a logical bridge between the evidence and the RFC determination. A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

The ALJ found that Plaintiff can perform light work involving: occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; and no climbing of ladders, ropes, or scaffolds. (R. 18). This RFC is the same one articulated by State

agency consultant Vidya Madala, M.D. on May 14, 2019. (R. 97-99, 110-12). Plaintiff argues that the ALJ erred in adopting Dr. Madala's opinion because it was not supported by any other evidence of record. (Doc. 17, at 13-14) (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("[A] non-examining physician opinion does not, by itself suffice as substantial evidence.")). This Court disagrees.

Since Plaintiff filed her claims in November 2018, the treating source rule used for claims filed before March 27, 2017 does not apply. This means the ALJ was not required to "defer or give any specific evidentiary weight" to any medical opinion, including a treating physician's opinion. 20 C.F.R. § 404.1520c(a). *See also* Social Security Administration, Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819 (Jan. 18, 2017). Instead, the ALJ was required to "evaluate the persuasiveness of each medical opinion based on certain factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) specialization; and (5) other factors, including the source's familiarity with other evidence in the claim or an understanding of Social Security disability policies and requirements." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. § 404.1520c(c)(1)-(5)). An ALJ must explain how he considered the first two factors (supportability and consistency) and may but is not required to explain his consideration of the other factors. 20 C.F.R. § 404.1520c(b)(2). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion." *Michelle D.*, 2022 WL 972280, at *4 (citing 20 C.F.R. § 404.1520c(c)(1)). "Consistency assesses how a medical opinion squares with other evidence in the record." *Id.* (citing 20 C.F.R. § 404.1520c(c)(2)).

The ALJ determined that Dr. Madala's opinion was persuasive because it was supported by the overall evidence of record. Plaintiff first injured her back in April 2018 when she fell on some ice at work. Internist Saritha Vankana, M.D. assessed low back pain and prescribed tramadol and Zanaflex (tizanidine). (R. 399-400). On July 11, 2018, Plaintiff was transported to the Elmhurst Hospital emergency department following a motor vehicle accident. She complained of cervical, thoracic, and lumbar pain at a level of 10/10, headache pain at a level of 10/10, and mild numbness and tingling in the lower extremities. (R. 19, 321). Though Plaintiff initially said she lost consciousness, she later denied that had occurred. (R. 316, 321). In any event, an exam was largely normal showing a steady gait, full range of motion in all extremities, and normal reflexes. (R. 318). CT scans of the spine, chest, abdomen, and brain were also normal. (R. 322-23, 325, 326). To address Plaintiff's diffuse posterior neck and back tenderness, doctors prescribed Flexeril and, at Plaintiff's request, tizanidine. (R. 318-19).

On July 19, 2018, Plaintiff saw orthopedic surgeon Bartosz Wojewnik, M.D. to review her CT scans. Dr. Wojewnik assessed diffuse back pain and radiculopathy, and "what appears to be S1 distribution on the back of the legs, as well as bilateral knee pain, right more than left, and left wrist pain, and forearm pain." (R. 338). He recommended that Plaintiff continue her medications (Flexeril, Medrol Dosepak, tizanidine, and tramadol), start physical therapy ("PT"), and return in 4 weeks. (R. 19, 338-39, 341). There are no further treatment notes from Dr. Wojewnik in the record but on July 28, 2018 Plaintiff saw chiropractor James Kopsian, D.C. (R. 365). At that initial evaluation, Plaintiff

complained of sharp, aching pain in the neck and back at a level of 10/10 that radiated into both legs and caused "serious" diminution in her ability to carry out daily activities. (R. 365).

On exam, Plaintiff walked with an antalgic gait, and palpation of the neck and thoracic spine demonstrated severe pain and severe muscle spasms, while palpation of the lumbar spine disclosed a vocalized, sharp pain response and severe muscle spasms. (R. 366-67). Plaintiff had trigger points at the trapezius muscles, moderate to marked restriction in range of motion of the cervical spine, moderate restriction in range of motion of the thoracic spine, and marked restriction in range of motion of the lumbar spine. (R. 367). Dr. Kopsian noted several positive test results, including the Jackson's compression test (which tests for cervical radiculopathy), the Maximum Cervical Compression (or Spurling's) Test (which tests for cervical nerve root compression), the Shoulder Depression Test (which tests for nerve root compression), Kemp's test (which assesses facet joint pain), and straight leg raise test. (R. 367-68). Dr. Kopsian treated Plaintiff with moist heat therapy and electrical muscle stimulation ("EMS"), gave her a good prognosis, and recommended further moist heat therapy and EMS treatments as well as PT exercises. (R. 368).

Plaintiff did not return to Dr. Kopsian and instead started treating with Aleksandr Goldvekht, M.D., a physical medicine and rehabilitation specialist, on August 6, 2018. Plaintiff complained of pain in her neck, lower back, forearms, and shins, and stated that bending, lifting, carrying, pushing, and pulling aggravated the pain. She reported being unable to sit for long periods due to discomfort. (R. 19, 355). On exam, Plaintiff exhibited decreased range of motion in bilateral lateral flexion of the cervical spine, and decreased

range of motion in bilateral lateral flexion and extension of the lumbar spine. There were tender trigger points at the levator scapulae and upper trapezius muscles bilaterally, as well as tenderness at the shins and forearms. Dr. Goldvekht noted hypertonicity (muscle tightness) bilaterally at the cervical paraspinals, lumbar paraspinals and quadratus lumborum muscle, and a Kemp's test was positive bilaterally. (R. 355). However, Plaintiff had normal reflexes, intact sensation, and strength of 4+ throughout all her extremities, and a straight leg raise test was negative. (*Id*.). Dr. Goldvekht assessed cervical whiplash injury/facetogenic pain, and lumbar whiplash injury/facetogenic pain. He prescribed Flexeril, instructed Plaintiff to undergo PT, and scheduled a follow-up for 4 weeks. (19, 355).

Between August 1 and September 28, 2018, Plaintiff attended 15 PT sessions. (R. 19, 358-64). When she returned to Dr. Goldvekht on September 10, 2018, her exam was unchanged and the doctor ordered MRIs of the cervical and lumbar spine, which were taken that day. (R. 356). The MRI of the cervical spine showed 1-2mm posterior annular disc bulges which indent the thecal sac at C4-C5, C5-C6, and C6-C7. (R. 370). The MRI of the lumbar spine showed that at L5-S1 there was an 8-9mm posterior central subligamentous disc herniation with extruded nucleus pulposus with significant central stenosis and mild bilateral neuroforaminal narrowing. (R. 371). At a follow-up visit with Dr. Goldvekht on September 17, 2018, Plaintiff's exam was once again unchanged. The doctor instructed Plaintiff to continue doing PT and taking Flexeril, and referred her to a pain care specialist. (R. 357).

On September 26, 2018, Plaintiff started treating with pain specialist Neeraj Jain, M.D. She complained of neck pain, lower back pain, and sleeping problems since the

motor vehicle accident. The pain consisted of "constant aches" at a level of 7/10 in the cervical and lumbar region that was worse with standing, sitting, bending forward and bending backwards, and alleviated by lying down and resting. Plaintiff reported numbness and tingling going down her buttock region, and pain all the way down her back from her neck. Her medications included Flexeril and Tylenol #3. (R. 349). On exam, Plaintiff exhibited significant hypertonicity (muscle tightness) upon palpation of the musculoskeletal region. She was able to forward flex up to 45 degrees and extend 5 degrees, but with complaints of pain bilaterally. Dr. Jain also noted significant pain upon palpation of the lumbar spine, with forward flexion up to 75 degrees and extension to 10 degrees with pain. A Kemp's test was positive bilaterally but Spurling's and straight leg raise tests were negative. (R. 19, 349). After reviewing the MRI tests, Dr. Jain diagnosed lumbar facet syndrome, lumbar discogenic pain, cervical facet syndrome, and cervical discogenic pain. He administered bilateral facet joint injections at L3-L4, L4-L5 and L5-S1. (R. 19, 347, 350).

On January 14, 2019, Brian J. Hertz, M.D. performed an Internal Medicine Consultative Examination of Plaintiff at the request of the Bureau of Disability Determination Services. Plaintiff complained of low back strain and carpal tunnel syndrome, and said that muscle relaxants, Medrol Dosepaks, and PT had done nothing to relieve her symptoms. (R. 20, 383). She reported being able to bathe and dress herself, do some minimal cooking and grocery shopping, and sit and stand, but said that sometimes sitting for prolonged periods of time bothered her and she needed to get up and move around. (R. 383-84). Her medications at the time included tramadol, tizanidine,

cyclobenzaprine, Medrol Dosepak, Lidocaine patch as needed, and diazepam as needed for anxiety.  (R. 384).

Plaintiff exhibited no discomfort moving about and was not using any assistive device during the exam.  (20, 384).  Her neck was supple and normal and Dr. Hertz noted full range of motion in the cervical, thoracic, and lumbar spine with no muscle spasms or tenderness.  A straight leg raise test was negative bilaterally, Plaintiff's posture and gait were normal, and she had no difficulty getting on and off the examining table, heel walking, toe walking, or tandem walking.  She was also able to squat and arise without any issues, and sit and stand normally.  (R. 20, 385).  Plaintiff had no difficulty with fine and gross manipulations with either hand, full grip strength of 5/5, and the ability to make a fist with both hands.  Her deep tendon reflexes and tone were both normal, and Babinski, Romberg, Tinel's and Phalen's signs were all negative.  Dr. Hertz noted that Plaintiff was "unable to reproduce symptoms of carpal tunnel or numbness and tingling." He also documented intact sensation and full motor strength of 5/5 in the arms and legs. Dr. Hertz assessed low back pain and carpal tunnel syndrome with no problems noted during the exam.  (R. 20, 386).

On March 14, 2019, Plaintiff started seeing Mark Farag, M.D. for pain management following the July 11, 2018 motor vehicle accident.[3]  (R. 20, 434).  Her primary complaint was neck and back pain that was sharp, burning, and present 80% of the time at a level of 8/10 at its worst.  She also reported radicular pain down both arms to the fingers and down both legs, worse on the right.  The back pain increased with prolonged walking,

---

[3]      Dr. Farag noted that Plaintiff was the restrained driver moving with the flow of traffic when she was rear-ended by a semitruck.  (R. 434).  Plaintiff reported that she was not having any neck or back pain prior to the accident and had not received any related medical treatment.  (*Id*.). (*Compare* R. 396-97, 399-400).

standing, and sitting, while rest and medications provided some relief. Despite taking tizanidine and tramadol, pain still woke her from sleep. (R. 20, 434). On exam, Plaintiff's gait was within normal limits, her sensation was intact, and she had normal range of motion on forward flexion and 5/5 strength in both arms. At the same time, she exhibited tenderness of 2/4 on palpation of the lumbar spine; reduced hyperextension (10/20 degrees); positive straight leg raise sign bilaterally; bilateral hip flexion and leg extension of 4+/5; and loss of sensation to light touch at S1. As for the cervical spine, Plaintiff exhibited tenderness of 2/4 on palpation of the neck; positive Spurling's test; loss of sensation to light touch at C6 and C7; and reduced range of motion in flexion (40/45), extension (25/45), lateral bend left (30/40); lateral bend right (30/40), and rotation (60/80). (R. 20, 436). Dr. Farag administered transforaminal epidural steroid injections at L5-S1, and instructed Plaintiff to continue taking tizanidine and doing her home exercises, and return in 2 weeks. (R. 437).

When Plaintiff saw Dr. Farag again on March 28, 2019, her low back pain had improved to a 6-7/10 with no numbness or tingling. Though Plaintiff still had difficulty walking for prolonged periods, she was able to do more activities like cleaning the house and engaging in bending activities. The neck pain had "not been too bothersome," and tramadol and tizanidine were helping. (R. 20, 444). On exam, Plaintiff's gait was within normal limits, she had full range of motion on forward flexion, and she had full strength of 5/5 in all muscles. She exhibited tenderness of 1/4 on palpation of the lumbar spine, tenderness of 1/4 on palpation of the neck, slightly reduced range of motion on hyperextension (15/20), positive straight leg raise bilaterally, and loss of light touch on the right at L5 and S1. Overall, Dr. Farag assessed Plaintiff's neck and back pain as

12

"improved" following the injections, but he suggested she try a lumbar orthotic brace to help reduce pain. (R. 20, 446-47).

At her next appointment with Dr. Farag on April 18, 2019, Plaintiff reported about 75% improvement since the injections. The back brace was helping and she was "not interested" in further injections, asking instead to try medical marijuana. (R. 20, 451). Dr. Farag gave her the prescription and said there was no need for further follow-up appointments unless she wanted to try more injections. (R. 20, 454). Shortly thereafter, on May 14, 2019, Dr. Madala gave her opinion as to Plaintiff's RFC.

Between May 21, 2019 and January 21, 2020, Plaintiff saw Dr. Vankana some nine times for a variety of issues, including itchy eyes, an iron burn, itchy scalp, a toothache, and vaginal problems. (R. 462-66, 475-76). At an appointment on October 25, 2019, she complained of back pain at a level of 10/10 and was using a walker. Plaintiff explained that she could not afford further injections since they were not covered by her insurance. (R. 475). Despite this, Dr. Vankana reported that Plaintiff "[l]ooks well" and recommended only that she do PT again. (R. 476). There is no evidence that Plaintiff pursued PT but she did request pain medications (Tylenol, Zanaflex) on November 6, 2019 and January 10, 2020. (R. 463, 487).

Plaintiff insists that this evidence supports her claim of disability and accuses the ALJ of cherry-picking facts that favored his ultimate conclusion. (Doc. 17, at 12-13). For example, Plaintiff objects to the ALJ's observation that she improved following the March 14, 2019 epidural steroid injections, noting that six months later she told her internist Dr. Vankana about severe back pain at a level of 10/10 that required the use of a walker. (*Id.* at 12). To begin, there is no evidence that any physician of record prescribed the walker

or believed Plaintiff needed it. In addition, the only abnormal finding on exam was tenderness in the lower lumbar spine, and as noted, Dr. Vankana merely prescribed continued medication and PT. The doctor also stated that Plaintiff "[l]ooks well" despite claims of excruciating pain of 10/10. (R. 476). And at appointments in December 2019 and January 2020, Dr. Vankana again provided nothing more than medication (Tylenol and tizanidine). (R. 463, 487).

More importantly, "[t]here is no error when there is no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ." *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018). *See also Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is [the plaintiff] offered no opinion from any doctor to set . . . limits . . . greater than those the ALJ set."). Here, Plaintiff does not point to a single doctor who found her more limited than Dr. Madala, and the ALJ incorporated the doctor's exact restrictions into the RFC.[4] *Compare Gudgel*, 345 F.3d at 470 (applying the old regulations, the ALJ erred in rejecting treating physician's diagnosis of post-polio syndrome without pointing to contradictory evidence); *Phillips v. Berryhill*, No. 17 C 4509, 2018 WL 4404665, at *4 (N.D. Ill. Sept. 17, 2018) (remand required where the ALJ did not rely on any medical opinions to support her RFC determination). Even before Plaintiff received the injections in March 2019, Dr. Hertz found in January 2019 that: she exhibited no discomfort moving about and was not using and did not need to use any assistive device; her neck was supple and normal; she had full range of motion in the cervical,

---

[4] Dr. Vankana's treatment notes from May 4 and June 15, 2018 indicate that Plaintiff was excused from work. (R. 396-99). The ALJ reasonably found the notes unpersuasive because they provided no duration or functional limitations and were inconsistent with evidence showing improvement with medication and injections. (R. 21). Plaintiff does not challenge this aspect of the ALJ's decision. *See Underwood v. Saul*, 805 F. App'x 403, 406 (7th Cir. 2020) (arguments not raised before the district court are waived).

thoracic, and lumbar spine with no muscle spasms or tenderness; her posture and gait were normal; she could sit, stand, and walk normally; her deep tendon reflexes and tone were both normal; she had intact sensation and full motor strength of 5/5 in the arms and legs; and all testing (Babinski, Romberg, Tinel's and Phalen's) was negative. (R. 20, 384-86). Plaintiff ignores this evidence and provides no explanation for how it supports greater restrictions than the ones set forth in the RFC.

Plaintiff next argues that the RFC failed to account for her manipulative limitations stemming from carpal tunnel syndrome and her need for frequent bathroom breaks due to ulcerative colitis. (Doc. 17, at 13, 15). But Plaintiff does not identify any physician of record who imposed restrictions for either condition, or point to any medical evidence supporting her allegations of disabling symptoms. Plaintiff first complained of right wrist pain when she saw Dr. Vankana on June 19, 2017, explaining that she had bumped it on something. Dr. Vankana noted tenderness on the dorsal side of the right wrist and instructed her to take Tramadol. (R. 405). Plaintiff continued to exhibit tenderness in the wrist on February 2, 2018 but there was no swelling and her treatment consisted of wearing a brace and taking Tramadol. (R. 401). X-rays of Plaintiff's wrists dated July 19, 2018 were normal with no acute fractures, lesions, or degenerative changes. (R. 338, 340-41).

Plaintiff complained to Dr. Goldvekht of forearm pain in August and September 2018 and told Dr. Jain she had radicular symptoms down her arms on September 26, 2018. (R. 349, 355, 356). But during her exam with Dr. Hertz on January 14, 2019, she had no difficulty with fine and gross manipulations with either hand, she had full grip strength of 5/5, and she could make a fist with both hands. In fact, Plaintiff was "unable

to reproduce symptoms of carpal tunnel or numbness and tingling." (R. 386). In March and April 2019, Plaintiff told Dr. Farag that she experienced hand numbness and tingling related to her carpal tunnel syndrome. (R. 444, 451). Over the course of nine appointments with Dr. Vankana between May 21, 2019 and January 21, 2020, however, Plaintiff never once complained about wrist pain or difficulties stemming from carpal tunnel syndrome. (R. 462-66, 475-76).

With respect to Plaintiff's ulcerative colitis, she has a history of the impairment but the first record showing a complaint is from August 24, 2018 when she presented to Dr. Vankana with abdominal pain and rectal bleeding. Dr. Vankana diagnosed an ulcerative colitis flare and prescribed Pentasa and Canasa (a suppository). More than a year later, on October 11, 2019, Plaintiff reported bleeding in her stool "off and on" for the previous three weeks but admitted to Dr. Vankana that she had stopped taking her Canasa. (R. 463). Plaintiff still had rectal bleeding in December 2019 and again admitted she had stopped using Canasa. Dr. Vankasa admonished Plaintiff that she "needs to take Canasa on [a] regular basis." (R. 463).

The ALJ explicitly addressed Plaintiff's carpal tunnel syndrome and colitis and reasonably concluded that neither constituted a severe impairment. (R. 17). As the ALJ explained, a January 2019 exam showed no manipulative deficits at all, and Plaintiff only complained of rectal pain and bleeding when she stopped taking her medications (*Id.*). Plaintiff does not explain how any of the cited medical evidence indicates she needs accommodations for wrist pain and rectal issues, and as noted, no physician imposed any associated restrictions. *Best*, 730 F. App'x at 382. Nor did any physician suggest Plaintiff would be off-task or absent from work due to her conditions, or that she needed

16

a sit-stand option (Doc. 17, at 15), which undermines her argument that the ALJ erred in including such restrictions in the RFC. As for Plaintiff's undeveloped assertion that the ALJ "fails to provide rationale connecting the RFC to Plaintiff's obesity and pain" (*id*. at 12), that argument is waived because Plaintiff "only made a cursory argument in h[er] opening brief and then never returned to it in h[er] reply." *Patterson v. Berryhill*, No. 17 C 50202, 2018 WL 6830331, at *4 (N.D. Ill. Dec. 28, 2018). *See also Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (quoting *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016)) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Even if not waived, the ALJ clearly addressed Plaintiff's obesity and incorporated that condition into the RFC determination. (R. 17, 21).

To the extent Plaintiff believes the ALJ should have accepted her own testimony and subjective reports to physicians about disabling pain and symptoms, this argument fails as well. In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts v. Kijakazi*, 27

17

F.4th 1273, 1278 (7th Cir. 2022)). "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts*, 27 F.4th at 1278.

Plaintiff testified that she cannot walk or be on her feet for more than 20 minutes at a time due to extremely bad back pain, which limits her ability to shop. (R. 38, 43). She also has sharp pain in her neck and cannot sit for more than 15 to 20 minutes. (R. 40, 43). Plaintiff wears wrist splints for her carpal tunnel syndrome and also puts her arm on a pillow and ices the area. The hand issues cause her to drop things and have difficulty gripping. (R. 40, 52). In addition, she has to go to the bathroom 5 to 6 times per day due to diarrhea and rectal bleeding, and testified that she lost a part-time job in 2019 because of absences and frequent, unscheduled bathroom breaks. (R. 39, 41, 53, 54). Plaintiff said that she can lift a gallon of milk but has not been able to tie her shoes in a year. (R. 44, 47). Though medication helps it does not completely alleviate her pain. (R. 50).

In discounting Plaintiff's testimony, the ALJ first found it inconsistent with the objective evidence. (R. 19). For reasons discussed previously, the Court finds no error in this assessment. Plaintiff had no functional limitations as of January 2019 (R. 383-86), her back and neck pain improved 75% following epidural steroid injections in March 2019 (R. 451), and she subsequently relied solely on medication for relief. Furthermore, she exhibited no manipulative limitations in January 2019, the only treatment she received for carpal tunnel syndrome was wrist splints, and the only time she complained of rectal pain

and bleeding was when she stopped taking her medications.  *See Thorps v. Astrue*, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) (citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)) ("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record.").

Plaintiff stresses that she was unable to afford additional injections as of October 2019 because they were not covered by her insurance.  (Doc. 17, at 13) (citing R. 475). Yet Plaintiff told Dr. Farag in April 2019 that she was not interested in receiving more injections, preferring to use medical marijuana.  (R. 20, 453-54).  And despite indicating a willingness to try PT in October 2019, there is no evidence that Plaintiff pursued that treatment option.  Instead, she merely requested medication refills on November 6, 2019 and January 10, 2020.  On January 21, 2020, moreover, Plaintiff said nothing about back, neck, or wrist pain at all.  (R. 488).  This reasonably undermines Plaintiff's claims of disabling pain at a level of 10/10.  *See, e.g., Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (receipt of conservative treatment is a legitimate reason to find a claimant not entirely credible").

Also unavailing is any suggestion that the ALJ erred in considering Plaintiff's activities of daily living.  The ALJ fairly determined that Plaintiff's ability to shop in stores once every two weeks for 5 to 6 hours, attend church, and do activities like cleaning around the house and bending is one factor weighing against the reliability of Plaintiff's statements.  (R. 19, 246-47, 444, 451).  *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time.  Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting

effects of her symptoms consistent with the applicable rules."). "The ALJ's credibility assessment need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)). The ALJ provided several valid reasons for discounting Plaintiff's complaints of disabling symptoms, and that decision is supported by substantial evidence.

Viewing the record as a whole, the ALJ did not err in adopting Dr. Madala's opinion that Plaintiff has an RFC for light work with certain postural restrictions. Plaintiff may have liked a more detailed discussion of the evidence, but the ALJ provided a sufficient analysis to allow the Court to trace his reasoning. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Charles M. v. Comm'r of Soc. Sec.*, No. 19-CV-1178-JES-JEH, 2021 WL 779979, at *3 (C.D. Ill. Mar. 1, 2021) ("The ALJ need not draft a novel to explain her reasoning. She must minimally articulate it, such that a reviewing court can trace her reasoning and her decision can be subjected to meaningful review."). As the Supreme Court has noted, "[s]ubstantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). The ALJ's decision satisfies this threshold and Plaintiff's request to remand the case for further consideration of the RFC determination is denied.

### 2.    VE Testimony

Plaintiff argues that the case still requires reversal or remand because the ALJ failed to reconcile the VE's testimony with the Dictionary of Occupational Titles ("DOT"). (Doc. 17, at 16).  Social Security Ruling 00-4p imposes "two basic obligations.  The first is the 'affirmative responsibility' to ask about 'any possible conflict' with the DOT."  *Cynthia T. v. Saul*, No. 18 C 50288, 2020 WL 564223, at *5 (N.D. Ill. Feb. 5, 2020).  "The second obligation, which is triggered if the VE's testimony 'appears to conflict with the DOT, is to resolve that conflict by eliciting a 'reasonable explanation' for it."  *Id*.  Where, as here, Plaintiff's counsel failed to raise a possible violation of SSR 00-4p at the administrative level, Plaintiff "now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without assistance."  *Id*.

As noted, the ALJ accepted the VE's testimony that a person with Plaintiff's background and the stated RFC could both (1) perform Plaintiff's past relevant work as a data entry clerk and a customer service representative, and (2) perform a significant number of other jobs available in the national economy, including garment sorter, mail clerk, and folder.  (R. 21-22).  Though Plaintiff is correct that the ALJ did not ask the VE whether her testimony conflicted with the DOT, Plaintiff fails to identify any actual conflict that existed in this case.  In such circumstances, the failure to ask is entirely harmless. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (ALJ's error in failing to ask the VE about any conflicts between his testimony and the DOT was harmless where there was no conflict).  Notably, Plaintiff makes no assertion that a person with her stated RFC cannot perform the jobs identified by the VE.  *Compare Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006) (remand required where the jobs identified by the VE all

required specific physical capabilities beyond the plaintiff's limitations as set forth in the RFC).

Viewing the record as a whole, there is no conflict in this case, obvious or otherwise, between the VE's testimony and the DOT. The ALJ did not err in relying on that VE testimony and the case need not be remanded for further consideration of this issue.

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and Defendant's Motion for Summary Judgment [22] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: August 9, 2022

SHEILA FINNEGAN
United States Magistrate Judge